## ERIE RAILROAD CO v ISRAEL BROTHERS CO

Ohio Appeals, 2nd Dist, Montgomery Co

No 1475. Decided Feb 8, 1938

H. D. Ferneding, McMahon, Corwin, Landis & Markham, Dayton, for plaintiff-appellant.

Jacobson & Durst, Dayton, for defendant-appellee.

**OPINION**

**By THE COURT:**

The above entitled cause is now being determined on plaintiff's appeal on questions of law from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

Plaintiff's action was one in replevin seeking to recover "88 rails of 33 feet length, each rail weighing approximately nine hundred (900) pounds, and seventy-one (71) pairs of angle bars; total value of said chattels was $1200.00." Affidavit of attachment accompanied the petition. The petition and affidavit complied with the statutory provisions relating to replevin suits. The answer of the defendant was a general denial.

It is disclosed from the pleadings and the evidence that the plaintiff was a corporation existing under the laws of the state of New York and as such corporation owning, maintaining and operating a railroad in and through Montgomery County and to and into the city of Dayton. .

The defendant, The Israel Brothers Company, was an Ohio corporation having its principal office and place of business in the city of Dayton and was engaged in operating a junk yard.

The case was tried to a court and jury. A verdict was returned in favor of the defendant.

Plaintiff's assignment of errors is set forth as follows:

"First: The court erred in refusing to declare the property claimed to be the property of the Railroad and in permitting the jury to pass upon the question.

"Second: Error in granting special charges before argument requested by the defendant.

"Third: Error in the general charge.

"Fourth: Error in excluding evidence.

"Fifth: The verdict was against the manifest weight of the evidence.

"Sixth: Error in the general charge with respect to instructions as to the deliberation of the jury.

"Seventh: Other errors on the face of the record."

An examination of the Bill of Exceptions discloses that there is very little conflict in the evidence on the issuable questions.

There are many points of difference as to the controlling law.

The following brief statement of facts will render understandable the nature of the controversy.

During the year 1934 some 145 street rails,, anglebars, connecting bolts and nuts together with spikes, were stolen from the right of way and track of the plaintiff railway company. This particular track had been relaid in 1908 and at that time was a main track over which the plaintiff company operated its railroad in and through the city of Dayton.

Following the 1913 flood and the organization of the Miami Valley Conservancy District a portion of the main track of the Erie Railway Company was moved to higher ground. In making the change of location the old track was not changed from its position but remained intact and was thereafter used as a storage track. By the term 'storage track' is meant a location for placing cars of the plaintiff company not then needed for immediate use.

Following the theft of the rails and other equipment appertaining to the track, investigation was made by the proper officers of the Railway Company, resulting in the arrest of Robert Corrigan and Richard Biddle, two residents of Dayton, Ohio. Both men gathered junk and sold to dealers. Following their arrest these two men finally admitted their guilt. In their first confession they did not implicate Israel Brothers as the concern to which they sold the steel rails and other material, but Corrigan at least made the statement that they were sold to another dealer. Biddle in the first instance, while admitting that he assisted Corrigan in the taking of steel rails and other equipment, yet claimed that he did not know to whom Corrigan made sale.

Later both men altered their prior statements and said that this material was sold to Israel Brothers.

Representatives of the plaintiff company in their investigation visited the yards of Israel Brothers and there claimed to have found 88 rails and 71 angle bars which it is claimed were identified as the property of the railway company. The manner and method of identification appeared as fol-

lows: A Mr. Herbert Daniels, section foreman for the plaintiff company, testifies that in the spring of 1934 he was ordered by his superior to examine the track in question and ascertain the number of railway ties necessary to reconstruct this particular piece of property. In going about this work he ascertained that the rails were 33 feet in length and were what is commonly known as 90 pound rails; that the number of ties per length of rail was 18. All the ties were in bad condition. Instead of counting the ties he counted the rails on the south side. He marked the rails with a piece of keel in consecutive order, starting with 1 and the last was 77. No marks were placed on the north rails. This witness Daniels testifies that some of the rails found in the Israel yards had on them the figures made by him.

Another method of identification was through the borings at the end of the rails by which the same were joined together with angle irons so as to make it a continuous track. It was testified that all railroads have different borings. The standard of the Erie Railroad used on 90 pound rails was what was termed 2 x 7. This means that the first hole through the rail would be 2 inches from the end of the rail and the second hole 7 inches from the first, or 9 inches from the end. Also, the diameter of the hole of this size rail was uniform, the standard being 7/8 of an inch.

Another method of identification was through what was called the heat numbers. It seems that the steel manufacturers of rails place on each rail in indestructible form the year rolled, the name of the steel company manufacturing and a number. From these markings it was disclosed that the 88 rails sought to be replevined were manufactured by the Lackawanna Steel Company, Buffalo, New York, each bearing a heat number. The heat number was presented in evidence as to each rail. Through the testimony of a Mr. Megowan, taken by deposition in New York, it was shown that the indicated heat numbers on the 88 rails were manufactured by the Lackawanna Steel Company and sold to the Erie Railroad in 1908. Testimony was offered that this particular track and extending to Enon was relayed in 1908. Further evidence of identification was that the length and weight of the rails sought to be recovered was the same as the rails in the existing track before the same was stolen. In addition thereto evidence was presented that the rails sought to be recovered from the yards, together with the angle irons, bore evidence of recently having been removed from the track through rust appearance.

It is and was the contention of counsel for the railroad company that §§9019 to 9024 GC, inclusive, are applicable. The trial court held these sections unconstitutional. This ruling of the court presents the principal ground of error, although other grounds are presented and will be considered. If the trial court was correct in its holding that the above sections of the Code are unconstitutional we then approach the determination of the remaining claimed errors upon a different basis than if found to be constitutional. In natural order we take up and determine the question of constitutionality first.

We are setting out the six sections in full:

"9019. **How railroad scrap metal sold.**— No officer, agent, or employee of a company operating a railroad, except the superintendent, general managing agent or a receiver of the company, may sell or dispose of worn or scrap metal, iron, brass, or other metal owned by it. All sales and barter of such scraps or other metals made by any other officer, agent, or employe shall be null and void. No such superintendent, managing agent, or receiver shall sell or dispose of such scrap or other metals in quantities less than one ton, nor without delivering to the purchaser a bill of sale thereof, a copy of which shall be retained and filed in the office of such superintendent, agent, or receiver."

"9020. **Violation of preceding section.**— If a superintendent, managing agent, or receiver of a company sells or disposes of railroad scrap metal in quantities less than one ton, or without delivering a bill of sale thereof to the purchaser, the company which he represents shall not thereafter be entitled to the benefit of the next three succeeding sections."

"9021. **Evidence of title of scrap.**—The person, company, or firm to whom is offered for sale, pledge, or trade, worn or used links, pins, journal-bearings, or other worn, used, detached appendages of railroad equipment, or scrap metal of iron, brass, or steel appertaining thereto, or to a railroad track, before purchasing or dealing in it shall ascertain whether the ownership thereof is lawfully derived, by bill of sale, or otherwise, from a company, or the superintendent, managing agent or receiver thereof. When the right or title to such

article of metal is drawn in question, in any suit, the person, company or firm dealing therein, his or its assignee, party thereto, must make prima facie proof of title and ownership so derived."

"9022. When mixture deemed a confusion.—If it appears prima facie, from the evidence on the trial, that any of the articles or metals in controversy were unlawfully obtained, and mixed or confused with other scrap metal, it shall be deemed a confusion of goods, unless the party claiming against the title of the company establishes, prima facie, a lawful title from or through a railroad company to the residue."

"9023. Company may replevy scrap.—By its proper officer or agent, or the receiver thereof, a company may claim to be the general owner of, and replevy any of the metals or articles mentioned in §9021, and metals with which they may have been confused, found in the possession of a person, firm or company, when there is good reason to believe that such metals or articles were unlawfully taken from a railroad company or its receiver. Instead of the usual averment as to ownership, in the affidavit for a writ of replevin, it shall be sufficient for the officer or agent of such company or the receiver, to aver that he believes such metals or articles were unlawfully taken from such company or some other company. The person, firm or company claiming in such action, the right or title to such metals or articles, prima facie shall prove a right or title thereto, lawfully derived as hereinbefore provided. In the absence of such proof, the company or receiver claiming such metals or articles shall be held to be the general owner thereof; but any other company or receiver, upon showing that part of such metals or articles unlawfully were taken from it or him, shall be entitled to such part, upon payment of a proper share of the cost and expenses of replevying it."

"9024. Liability of Company or Receiver. —If a company, or its receiver replevies property under the next preceding section without reasonable cause to believe that it was unlawfully taken from some company or its receiver, such company or receiver shall be liable to the party entitled thereto. In any sum not exceeding double the value of the property so replevied in addition to such damages as such party sustains thereby."

It has been suggested that the trial court in the main predicated his determination that the act was unconstitutional on two cases previously decided by the Supreme Court of Ohio, being Miller v Crawford, 70 Oh St 207 and Williams, etc., Company v. Preslo, 84 Oh St 328. In both decided cases the Supreme Court declared certain acts of the Legislature prescribing a bulk sale law were unconstitutional. The Preslo case, supra, was decided June 13, 1911, and of course the Crawford case, earlier.

On September 3, 1912, §2, Art XIII of the Constitution of Ohio was amended. The pertinent portion of this amended Section 2, Article XIII reads as follows:

"Laws may be passed regulating the sale and conveyance of other personal property, whether owned by a corporation, joint stock company or individual."

In April, 1913, the Legislature enacted §11,102 et seq. GC all pertaining to a new bulk sales law. The question of the constitutionality of this Act was again brought to the attention of the Supreme Court in the case of Steele, Hopkins & Meredith Co v Miller, 92 Oh St 115. The decision in the above case was May 4, 1915. The Act was declared constitutional. The two cases above referred to, wherein the bulk sales law was declared unconstitutional were considered. In the opinion by Johnson, J., the first paragraph refers to these two cases by title. The Judge rendering the opinion makes this further comment:

"In those cases it was held that previous acts of the Legislature similar to those in question here were unconstitutional."

Running through the opinion it clearly appears that the constitutional amendment of 1912 was the basis for declaring the act then under consideration constitutional. The first syllabus of the case reads as follows:

"1. Sec 2 of Art XIII of the Constitution as amended September, 1912, contains a specific grant of power to the Legislature to provide by law for the regulation of the sale and conveyance of personal property, and is a qualification to that extent of the guarantys contained in the Bill of Rights."

It is obvious that the 1912 amendment of the Ohio Constitution was the sole controlling reason for the pronouncement of the constitutionality of the bulk sales act. But

662

for the amendment to the Constitution undoubtedly their decision would have been identical as in the two previous decided cases.

It is undoubtedly true that the decision of the Supreme Court declaring the bulk sales law unconstitutional was a potent factor in the constitutional amendment of 1912. The constitutional amendment is not limited in its application. On the contrary it is very general. Note the Language:

"Laws may be passed regulating the sale and conveyance of other personal property."

Under this broad constitutional power we can arrive at but one conclusion, that the Legislature had the right to enact laws relative to the sale of 'scrap metal'. Secs 9019 to 9024 GC inclusive, pertain to the sale of scrap metal.

In addition it comes under the proper designation as a police regulation. It is intended primarily to protect railroad scrap metal against theft. Scrap metal stolen from railroad companies has little value to the thief unless he can sell it to some dealer in scrap. The equipment used by all railroads is largely identical in character; hence, the metal from one would be the same as the metal from another. This frequently would make positive identification almost impossible. It probably could be shown that it was railroad scrap metal, but it would be difficult to show from which railroad it was stolen. To meet this situation the Legislature sought to make effective its enactment by taking away certain defenses from the dealers. The act in no sense deprives a dealer from buying junk, but it is provided that before he buys it he must know that the seller came by his property rightfully. Sec 9019 GC provides that no officer, agent or employe of a company operating a railroad may dispose of any metal owned by it except by the superintendent, general managing agent or a receiver.

It is further provided that all sales made other than by the superintendent, general managing agent or a receiver shall be null and void. Further provision is made that no sale shall be made in quantities less than one ton nor without delivering to the purchaser a bill of sale therefor, copy of which should be retained and filed in the office of such superintendent, agent or receiver. Sec 9020 GC denies to the railway company the benefit of §9019 GC in all in-

stances where the superintendent, managing agent or receiver makes sales in quantities less than one ton or without delivering a bill of sale therefor. Sec 9021 GC places upon the dealer in such metal before purchasing the obligation to ascertain whether or not the seller has a bill of sale to such property. The last paragraph of this section places upon the dealer the obligation when the title is drawn in question in any suit to make prima facie proof of his title and ownership. Sec 9022 GC provides against mixing and confusing with other scrap metal through which identification would be rendered difficult if not impossible.

Sec 9023 GC provides for the replevin of such railroad metals found in the possession of any person, firm or company when there is good reason to believe that such metals or materials were unlawfully taken from a railroad company or its receiver. The averment in the pleadings and affidavit may be made upon belief. Thereupon it devolves upon the person, firm or company having possession of such metals to prove a right or title thereto lawfully derived as provided in preceding sections. The last paragraph of this section provides that in the absence of such proof the company or receiver claiming such metal or articles shall be held to be general owner. The latter part of this paragraph provides for other railway companies or receivers obtaining any portion of such metals upon satisfactory showing that they are entitled to such part. Sec 9024 GC provides liability against the company or receiver for instituting replevin actions under the act without reasonable cause to believe that it was unlawfully taken from such company. The only part of the act concerning which we have the slightest question as to its constitutionality is the last part of the last paragraph of §9023 GC. Even if this part of the section should be determined unconstitutional it would not necessarily affect the remaining parts of the act.

"An entire statute will not be held unconstitutional merely because a part of it was unconstitutional unless such part is so related to the whole as to raise presumption the statute would not have been enacted without it."
State v Conn, 116 Oh St 127.

The above questionable part of the enactment can very readily be eliminated without affecting the remainder. Furthermore, this part of the enactment is in no

way involved under the facts in the instant case.

Having arrived at the opinion that the pertinent parts of the above enactment are constitutional, we next inquire as to its effect on the issues presented in the instant case. Henry Israel and David Israel, active officers of the defendant company, were called by the plaintiff for cross-examination, and also testified as defendant's witnesses. The evidence is active officers of the defendant company had no bill of sale and never took a bill of sale for any scrap railroad metal as required under the act above quoted. They made the claim that they had in their possession at the time of instituting their replevin action some 800 tons of railroad steel rails. No attempt was made by them to identify any purchases through which it might be shown that the 88 rails in controversy were legally obtained by the defendant. There was some evidence, rather indefinite and vague, as to some purchase by Israel Brothers of scrap railroad metal including rails from the Conservancy District when it took over a part of the railroad right of way near Enon, Clark County. This was sought to be connected up with the showing that the Erie Railroad Company relayed its entire line from Dayton to Enon in 1908 and that such relay included the track from which it ,was claimed these rails were stolen. It is sought to infer that the heat numbers on the 88 rails may have been in fact on the part of the track between Enon and Dayton. The defendants present no definite evidence that the 88 rails were taken from the track between Enon and Dayton and afterwards sold by the Conservancy District. Even if bought by the Conservancy District and afterwards sold by it there would still be the obligation to provide a bill of sale. Israel Brothers did not buy direct either from the railroad or from the Conservancy. They claimed to have purchased from a dealer by the name of Frank. Giving all evidence on this question its most favorable interpretation it may not be ▆▆▆▆▆▆▆ ▆ said when considered in the light of the act that defendants made a prima facie showing of their right or title to the 88 rails in question. Counsel for the defendants strenuously urge that even if the act is constitutional that the plaintiff will be denied the benefit of such act by reason of §9020 GC. This is the section wherein it is provided that the railroad company shall not have the benefit of the act if a superintendent, managing agent or receiver sells or disposes of railroad scrap metal in quantities less than one ton or without delivering a bill of sale. A complete answer to this contention is that there is no evidence in the entire record disclosing that any superintendent, managing agent or receiver of the plaintiff company ever made any sales without complying with the section. There is evidence that a present section foreman, several years previous, when working for the Dayton Elevated, negotiated the sale of some rails to Israel Brothers, but he says that he did not complete the sale nor collect the money. In any event he was not then working for the Erie Railroad. He does not know whether a bill of sale was or was not passed. One of the Israels in their testimony says that he never procured a bill of sale and that he had bought rails from many railroads including the Erie. If it be assumed that this statement means that he made his purchase of the Erie through its superintendent or managing agent there is still the absence of evidence to identify the 88 rails in controversy. Counsel construes the section to mean that if at any time a railroad company sells its metal without ▆▆▆▆▆▆ ▆ complying with the section it is foreclosed forever from invoking the benefits. We can not follow this argument. It is our judgment that each transaction must stand on its own state of facts.

Having determined that the act is constitutional as it affects the instant case the determination of many questions discussed in briefs of counsel is not necessary. The defendant has failed totally to make its prima facie case of ownership as required under the act. On the other hand, the plaintiff went beyond the provisions of the act and presented detailed evidence as to the identification of the rails in question.

This we believe to be required in replevin before the plaintiff is entitled to a verdict. That is to say, that failure of proof of right of possession ▆▆▆▆▆ ▆ in the defendant will not meet the necessity of affirmative proof of such right in plaintiff if it is to maintain its action and have an award of the property replevined. In our judgment the plaintiff met this requirement of proof and the verdict of the jury to the contrary is against the manifest weight of the evidence. However, upon this question there

is an issue of fact for the jury upon all the evidence in the record.

Judgment reversed and cause remanded.

BARNES, PJ, HORNBECK and GEIGER, JJ, concur.

## ON MOTION FOR REHEARING

Decided March 15, 1938

By THE COURT:

The above entitled cause is now being determined on defendant-appellee's application for rehearing. The memoranda appended calls attention to the fact that since the weight of the evidence is one of the grounds for reversal further proceedings in the Supreme Court may be futile. We might say that the original opinion as first written reversed the cause and entered final judgment. Before releasing, however, the final determination was modified so as to reverse on the weight of the evidence. The major reason for this change in our conclusion was the questioned constitutionality of parts of §9023 GC and the answer of the jury to special interrogatories. The particular part of §9023 GC, questioning the constitutionality is that portion wherein it purports to hold that the right of possession of any other railroad company might be a sufficient predicate for determining that plaintiff had the right of possession.

Through our further examination of the record following the application for rehearing we have arrived at the conclusion that final judgment should be entered.

The trial court declared the entire act (§9019 to 9024, inclusive) unconstitutional and tried the case according to the law applying to replevin actions generally. Very early in the trial the court indicated his trend of thought and thereafter plaintiff introduced its evidence in conformity to this theory. In addition evidence was presented through cross-examination of the Israel Brothers, conclusively establishing that they had no bill of sale for the scrap railroad metal sought to be replevined, nor did they ever take bill of sale in any instance although they had for many years been heavy buyers in railroad scrap iron, including railroad rails. Plaintiffs through their evidence presented more than a prima facie case supporting their claim of ownership and right of possession and the question as to the weight of the evidence would be a debatable one even on the theory of the unconstitutionality of the scrap metal sections of the Code heretofore referred to.

Our court being of the opinion that the scrap metal sections with the possible exception of portions of §9023 GC are constitutional, the defendants are left without a defense.

Having positively and repeatedly testified that they have no bill of sale and never took one there is no possibility of presenting a defense in a new trial.

It is apparent that if upon a new trial a jury returned a verdict in favor of the defendant, it could not stand.

The present record will very effectively raise the question of the constitutionality of the scrap metal sections in the event defendants desire to carry the case to the Supreme Court.

It is fair to say that defendant's application for rehearing does not directly or inferentially request a modification of our finding so as to enter a final judgment. This we do on our own motion. Our original opinion is hereby modified so as to enter final judgment instead of remanding for new trial on the weight of the evidence.

Entry may be presented in conformity to this opinion.

BARNES, PJ, HORNBECK and GEIGER, JJ, concur.