OPINION
{¶ 1} Appellant, Gordon Proctor, Director of the Ohio Department of Transportation, appeals a jury's award determining just compensation and damages for appropriating land belonging to appellee, Costal Brothers t/a Splash Shine Auto Bath, in order to accommodate a highway improvement project on State Route 422 ("Route 422") in the city of Girard.[1]
 {¶ 2} Appellant filed a petition to appropriate property owned by appellee on June 19, 2002, depositing a sum of $12,225 with the clerk of courts on the same day. The purpose of the project was to widen approximately two miles on Route 422, rebuild the existing curb, improve the drainage through the area, and upgrade the lighting and signals throughout the route.
 {¶ 3} Appellee owns a commercial car wash on the corner of Route 422 (State Street) and Ella Street in Girard, with one hundred fifty feet of frontage along Route 422, and one hundred twenty-five feet of depth along Ella Street, for a total area of 18,760 square feet of land, or .43 acres. The amount of land permanently taken by appellant amounted to a five-foot strip along the front of the property on Route 422, resulting in .02 acres, or eight hundred seventy-one square feet. The temporary easement resulted in a take of .052 acres, or 2,265 square feet.
 {¶ 4} After discovery was completed, appellant filed a motion in limine to prevent the introduction of appellee's expert's, Barry Dunaway ("Dunaway"), valuation testimony. The trial court denied the motion.
 {¶ 5} A jury trial commenced on June 26, 2005. The parties stipulated that the date of the take was March 20, 2003.
 {¶ 6} Appellant first presented James Kinnick ("Kinnick"), a professional engineer and real estate administrator for appellant. He testified that the purpose of the widening project on a 2.1 mile stretch of Route 422 in the city of Girard was to improve traffic flow and reduce accidents. Actual construction began in spring of 2003, and the project was completed in early fall of 2004.
 {¶ 7} Kinnick testified that prior to the take, appellee had two access points from Route 422 and two from Ella Street, and after the take, there were still two access points. Kinnick described that one of the purposes for installing curbing, besides better drainage, is that there are less accidents when there are less access points. Kinnick further recalled that prior to the take, the distance from appellee's building to the existing right-of-way was 50.7 feet, and that appellee could stack two cars behind each of the nine car wash bays, using nineteen feet (standard appellant uses) as the length of the car. After the take, the distance was reduced to 45.7 feet.
 {¶ 8} Kinnick admitted on cross-examination that appellant reduced appellee's access points on Route 422 from a sixty-eight to a fifty foot opening, and a forty to thirty-six foot opening, shrinking the total access in the front by twenty-two feet. However, due to flaring at the curb (because of federally required curb ramps), the practical access was actually limited to sixty-six feet, or a forty-two foot reduction, which amounted to a thirty-nine percent reduction. In addition, he stated that appellee's property in the front of his building was decreased by eleven to 11.5 percent.
 {¶ 9} Next, was Robert Lyden ("Lyden"), a private consulting engineer, who testified for appellee. He indicated that before the take, appellee could stack three cars behind each car wash bay, using 15.9 feet as the average car length of all cars manufactured in the United States in 2004, for a total of twenty-seven cars. Prior to the take, cars could pull straight into either of the two front access points, and then pull directly into the bay. After the five-foot take, only two cars could be stacked behind each bay, and it was not a direct access into each one.
 {¶ 10} Dunaway testified after Lyden for appellee. He indicated that he utilized two accepted appraisal methods, the comparable sales approach and the cost less depreciation approach, to arrive at his opinions of value in this case. He used the comparable sales market approach to value the land and the cost less depreciation approach to value the building, concrete, and equipment on the land. He opined that the fair market value of the entire property before the appropriation was $334,350. He estimated the fair market value of the land taken to be $5,266. Thus, in his opinion, the fair market value of theresidue (the remaining land) before the appropriation was $329,084.
 {¶ 11} Dunaway was then asked if he had an opinion as to the fair market value of the residue after the take. He stated that he did. He explained that he studied appellant's plans for the property and determined what effect the take would have on the residue. Appellant objected due to lack of foundation. The trial court overruled the objection.
 {¶ 12} Dunaway described the negative effect the plans would have on the property; i.e., the damage factors that he considered, including the fact that the car wash building would be 46.25 feet to the road, and thus, five foot of depth was taken from the front of the property. He considered the loss of appellee's ability to stack cars; i.e., prior to the take, appellee could stack three medium size cars at each of the nine bays, for a maximum holding pattern of twenty-seven cars. After the take, only fourteen cars could be stacked. In addition, prior to the take, cars had direct access to all nine bays. After the appropriation, Dunaway indicated that there would only be direct access to five of the bays due to the configuration of the curbing. Finally, the new design would allow more vehicles to cut through appellee's land to get to the adjoining commercial entity.
 {¶ 13} After Dunaway testified to the damage factors, he was asked if he had an opinion as to the fair market value of the residue after the appropriation. Appellant renewed his objection due to lack of foundation, to which the trial court overruled. Dunaway then stated that the fair market value of the residue after appropriation was $279,721. He then subtracted the difference between the fair market value of the residue after the take from the fair market value of the residue before the take, resulting in a difference of $49,363. Thus, this amount was what he determined to be the damage to the residue.
 {¶ 14} Dunaway further indicated that he appraised the fair market value of the temporary easement, which was taken for eighteen months. He calculated the amount of compensation due to appellee for the temporary easement based upon how much it would cost to rent the fifteen feet, which according to Dunaway, was $18,750.
 {¶ 15} Appellant's expert, Brian Mocilnikar ("Mocilnikar"), testified that the permanent land appropriated was worth $7,950, the temporary easement was worth $2,675, and there was no further damage to the residue. He based his opinion for the permanent take on the cost depreciation approach and the direct sales comparison approach. With respect to the temporary easement, he based his opinion on a ground lease of ten percent per year, and then capitalized that amount for eighteen months. Thus, he multiplied .052 acres of an underlying land value of $340,000, capitalized that at ten percent times eighteen months, and determined that $2,675 was owed to appellee for the temporary easement.
 {¶ 16} Throughout the trial, and at the end of the trial, appellant properly renewed his objections to Dunaway's valuation testimony and moved to strike it.
 {¶ 17} After four days of trial, the jury awarded appellee $7,950 as compensation for the property permanently appropriated, $9,000 for the temporary easement, and $12,000 for the damages to the residue, for a total award of $28,950. The trial court journalized the verdict on August 22, 2005.
 {¶ 18} It is this judgment from which appellant appeals, raising the following three assignments of error:
 {¶ 19} "[1.] The trial court erred to the prejudice of appellant in admitting opinion testimony of the property owner's expert witness on damages to the residue and value of the property after a partial taking.
 {¶ 20} "[2.] The trial court erred by refusing to strike all of the property owner's testimony concerning damage to the residue where the expert's opinion include[d] factors for which compensation could be claimed as a matter of law and the expert could not eliminate those factors from his total opinion of damages.[2]
 {¶ 21} "[3.] The trial court erred to the prejudice of the director by overruling the director's objection and by denying his motions to strike the testimony of the owner's expert concerning valuation of a temporary easement which was without foundation of any accepted appraisal method or any real estate market data."
 {¶ 22} We note that appellant does not contest the jury's verdict with respect to the compensation for the permanent taking, but contests the jury's award for the damages to the residue and for the temporary easement.
 {¶ 23} In an appropriation case, much must be left to the discretion of the trial court on the matter of admitting or excluding evidence relating to the value of appropriated property. Ohio Turnpike Commissionv. Ellis (1955), 164 Ohio St. 377, 388. An appellate court's review on a trial court's admission or exclusion of evidence is whether the lower court abused its discretion. In re Estate of Visnich, 11th Dist. No. 2005-T-0128, 2006-Ohio-5499, at ¶ 30. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable.Wilmington Steel Products, Inc. v. Cleveland Elec. Illum. Co. (1991),60 Ohio St.3d 120, 122. With this review in mind, we now consider the merits of appellant's arguments concerning appropriate evidence in an appropriation valuation proceeding.
 {¶ 24} The landowner is entitled to receive not only the value of the appropriated land, but also compensation for any damage to their remaining property (the residue) as a result of the take. Wray v.Stvartak (1997), 121 Ohio App.3d 462, 471. In Wray v. Mussig (Sept. 20, 1996), 11th Dist. No. 95-L-172, 1996 Ohio App. LEXIS 4113, at 20- 21, this court explained the concepts of compensation and damages as follows:
 {¶ 25} "[i]In Ohio, there is a distinction between the 'compensation' which the state must confer upon the property owner for appropriated land, and the 'damages' the owner suffers as a consequence of the appropriation. American Louisiana Pipe Line Co. v. Kennerk (1957),103 Ohio App. 133, 137 * * *.
 {¶ 26} "Compensation" means the sum of money which will compensate the owner of the land actually taken or appropriated; that is, it is the fair market value of the land taken, irrespective of any benefits that may result to the remaining lands by reason of the construction of the proposed improvement. "Damages" in the strict sense in which the term is used in an appropriation proceeding, means an allowance made for any injury that may result to the remaining lands (i.e., the 'residue') by reason of the construction of the proposed improvement, after making all permissible allowances for special benefits, and the like, resulting thereto. Norwood v. Forest Converting Co. (1984), 16 Ohio App. 3d 411,415 * * *." (Parallel citations omitted.)
 {¶ 27} Both appellant and appellee rely on Mussig in support of their respective positions. Appellant argues that Dunaway's testimony should have been stricken since his post-take value of the residue, (and of the temporary easement), was not based on a proper foundation of accepted appraisal method pursuant to our holding in Mussig. Appellee contends that Dunaway's testimony was sufficient and did not violate our holding in Mussig.
 {¶ 28} In a recent case, Proctor v. N E Realty LLC, 11th Dist. No. 2005-T-0051, 2006-Ohio-3078, at ¶ 19-22, a case strikingly analogous to the one at bar, we analyzed the Mussig case and its holding at great length, stating (in the following four paragraphs):
 {¶ 29} "Under its first assignment of error, ODOT contends that Mr. Dunaway's testimony regarding valuation should have been stricken, since his appraisals of the post-take value of the residue, and of the temporary easement, were improperly calculated. ODOT's arguments center on the interpretation of our prior decision in the Mussig case. InMussig, the property owner's valuation expert appraised the pre-take value of the subject land under one of the approved methods. Id. at 3-4, 24. In determining damages to the residue, however, he simply noted certain consequences of the taking — including loss of potential parking — and determined that the residue had lost 25 per cent [sic] of its pre-take value. Id. at 5.
 {¶ 30} "On appeal, ODOT argued that the property owner's expert's testimony should have been stricken, since his post-take valuation of the residue was improper and inadmissible. Cf. Mussig at 7. This court agreed, determining that, subject to the Rules of Evidence, an expert valuation of the pre-and post-take value of appropriated property had 'to be founded on one of the three recognized methods of appraisal to be admissible.' Id. at 24.
 {¶ 31} "* * * ODOT seems to argue that Mussig requires separate appraisals, under one of the approved methods, before and after the taking. This was the method adopted by ODOT's expert, Mr. Vogel. While this may be 'best practice,' we do not think the holding inMussig goes so far. Rather, Mussig requires that the valuation expert's testimony be founded on one of the three recognized methods of appraisal to be admissible. Thus, once a pre-take value is properly established under a recognized method of appraisal, an appropriate figure for the value of the residue might be derived therefrom by subtracting the compensation for the take, and an intelligible and explicable damage figure for the residue.
 {¶ 32} "* * * Mr. Dunaway gave the factors he considered in determining there was damage to the residue, and explained why these were significant in his expert opinion. Since he had calculated the pre-take value of the subject property under one of the approved appraising methods, this was sufficient to establish the admissibility of his testimony regarding the post-take value of the residue, and damages. Any problem went to the weight of his testimony."
 {¶ 33} Again, in the case at bar, Dunaway, the same expert used by the property owner in N E Realty, supra, indicated that he utilized two accepted appraisal methods, the comparable sales approach and the cost less depreciation approach, to arrive at his opinion of the value of the residue (remaining land) before the take. He opined that the fair market value of the entire property before the appropriation was $334,350, $5,266 for the land taken, and thus, the fair market value of theresidue before the appropriation was $329,084.
 {¶ 34} Dunaway, over an overruled objection, described the negative effect the plans would have on the property; i.e., the damage factors that he considered, including the fact that the car wash building would be 46.25 feet to the road, and thus, five feet of depth was taken from the front of the property. He considered the loss of appellee's ability to stack cars; i.e., prior to the take, appellee could stack three medium size cars at each of the nine bays, for a maximum holding pattern of twenty-seven cars. After the take, only fourteen cars could be stacked. In addition, prior to the take, cars had direct access to all nine bays. After the appropriation, Dunaway indicated that there would only be direct access to five of the bays due to the configuration of the curbing. Finally, the new design would allow more vehicles to cut through appellee's land to get to the adjoining commercial entity.
 {¶ 35} After Dunaway testified to the damage factors, he was asked if he had an opinion as to the fair market value of the residue after the appropriation. Appellant renewed his objection due to lack of foundation, to which the trial court overruled. Dunaway then stated that the fair market value of the residue after appropriation was $279,721, resulting in $49,363 as the amount of damages to the residue.
 {¶ 36} After reviewing Mussig, as well as our recent holding in N E Realty, we conclude that the trial court did not err when it overruled appellant's motion to strike, and admitted Dunaway's expert opinion. As in N E Realty, the expert based his pre-take appropriation value on two of the three recognized methods of appraisal. Thus, it was appropriate for him to base his opinion of the post-take value of the residue on "intelligible and explicable damage[s]" and any problem went to the weight of the testimony. N E Realty at ¶ 21-22. As such, appellant's first assignment of error is without merit.
 {¶ 37} In his second assignment of error, appellant argues that the trial court erred in admitting Dunaway's valuation testimony because he arrived at his value for damages based upon factors that he was not permitted to consider as a matter of law. Specifically, Dunaway testified that he considered as part of the damages the reconstruction of curbing which resulted in it being more likely that vehicles would drive through appellee's property to get to the adjoining property.[3]
 {¶ 38} In State ex rel. Preschool Dev., LTD v. Springboro,99 Ohio St.3d 347, 2003-Ohio-3999, at ¶ 13, the Supreme Court of Ohio stated:
 {¶ 39} "`"[i]n cases of (* * *) destruction of fundamental attribute of ownership like the right of access, the landowner need not establish the deprivation of all economically viable uses of the land."' (Emphasis sic.) State ex rel. Sekermestrovich v. Akron (2001), 90 Ohio St.3d 536,537-538 * * *, quoting State ex rel. BSW Dev. Group v. Dayton (1998),83 Ohio St.3d 338, 342 * * *. Instead, the landowner must demonstrate 'a substantial or unreasonable interference with a property right.'State ex rel. OTR v. Columbus (1996), 76 Ohio St.3d 203, 206 * * *." (Parallel citations omitted.)
 {¶ 40} In Springboro, Preschool Development had sought a writ of mandamus to force the city of Springboro to bring an appropriation action after Springboro had eliminated a curb-cut in front of Preschool Development's property. While Preschool Development no longer had direct access to S.R. 73, Springboro granted Preschool Development and the public a permanent easement between Preschool Development's property and S.R. 73 through an adjacent shopping center. The court held that even though drivers were required to negotiate an additional turn and travel an extra 300 feet, Preschool Development did not incur a compensable taking. Id. at ¶ 15. The court concluded that the mere circuity of travel, or lack of a straightforward alternative, did not substantially or unreasonably interfere with Preschool Development's property rights. Id.
 {¶ 41} Here, Dunaway was asked on cross-examination to explain the damage factor that he considered regarding his opinion that more cars would travel through appellee's property to get to the adjoining property. Dunaway replied, "* * * [t]he curb obstructions of the adjoining property owner are going to obstruct his property getting in and out. Potential customers to his business are going to want to get in and out the easiest way possible, and a very easy way would be to cut through the car wash and not have those curb obstructions in front of the adjoining property owners." He further clarified that "the curbing along 422 after the take, after it is finished, is creating a need for potential customers for the adjoining property owners to cut through the Coastal Brothers space." Finally, when asked if he could tell the jury how much of the $49,363 was related to the dollar amount attributed to this factor, he simply stated that his total valuation was a combination of all three.
 {¶ 42} Appellee argues, however, that the evidence and testimony of appellant's engineer, appellee's engineer and Dunaway, were sufficient to show that the reconfiguration of the curbs and/or access unreasonably and substantially restricted appellee's access to the property. We disagree.
 {¶ 43} The reconfiguration of curbing in this case did not rise to the level of substantial or unreasonable interference. Appellee still had two access points from both Ella Street and Route 422. Furthermore, the adjacent property owner's curb reconfiguration has no affect on appellee's access. Due to Dunaway's inability or refusal to break down his opinion on damages, his testimony regarding the damages should not have been submitted to the jury. As such, the trial court abused its discretion in admitting this evidence. See, also, N E Realty, supra, at ¶ 25-27 (where we also held that it was reversible error to admit the expert's testimony when he could not sever the curbing issue from any other damage factor that he considered). Therefore, appellant's second assignment of error has merit.
 {¶ 44} In his third assignment of error, appellant argues that the trial court erred when it overruled his objections, denied his motion to strike, and admitted appellee's expert's testimony concerning the value of the temporary easement, since the expert's opinion of value of the temporary easement was arbitrary and not based on any accepted appraisal method. For the reasons that follow, we agree.
 {¶ 45} "In Wray v. Parsson (1995), 101 Ohio App.3d 514 * * *, the Ninth District Court of Appeals * * * held that * * * in determining the fair market value of a temporary easement[,] (* * *), [s]uch temporary conditions that impair the enjoyment of the residue are properly considered in determining the value of a temporary taking because they are the kinds of factors that an ordinarily prudent business person would consider in establishing rental value.' Parsson, supra,101 Ohio App.3d at 519 * * *." Wray v. Deters (1996), 111 Ohio App.3d 107, 110-111. Thus, determining a rental value for a temporary easement is an accepted method to appraise a temporary easement.
 {¶ 46} In N E Realty, supra, we addressed a similar issue as presented here. In that case, the expert (Dunaway) "testified that the value of the temporary easement through N E's property was $12,685. He arrived at this figure by determining that a lessor of the subject easement would pay a rental of 2 per cent [sic] of the entire property for the land subject of the easement, which comes to $8,457 per year. This translates to $12,685 for eighteen months." Id. at ¶ 9. The appellant in N E Realty (Proctor) argued that "[a]n expert's opinion of value of a temporary easement * * * which amounts to an arbitrary percentage of value of an entire commercial property * * * and does not follow any accepted appraisal method is not reliable and should not be admitted into evidence at an appropriation trial." We agreed, concluding that "Mr. Dunaway simply did not use one of the approved appraisal methods in valuing the temporary easement. Pursuant to all authority which we can find, this made his testimony on that easement's value inadmissible." Id. at ¶ 23.
 {¶ 47} Here, with respect to valuing the temporary easement, Dunaway testified that the area of the temporary easement was 2,265 square feet and the duration of the temporary take was eighteen months. He was then asked how he valued the temporary easement. He stated, "the consideration is I have got — you have to put a value on what you would expect to rent the temporary easement or the land in the temporary easement for. * * * [I]deally, you wouldn't want to rent the front of the property whether it be a residential property or a commercial property or whatever. It is bringing about, again, just obstructions getting in and out, whatever work is being done you have * * * to deal with that for the period of time that the State would have the right to come on at any time of day or night and do the work or occupy that temporary property. So, in an [i]deal world, you wouldn't want to rent that but, again, we have to place some value on it, so, yes, I did determine and have a consideration as to how I arrived at that." Appellee's attorney then asked what his opinion was, and over the objection of appellant, Dunaway replied that it was $18,750.
 {¶ 48} Appellee argues, "[t]here is no established market for this type of easement because it is not common practice to lease or rent a 15' space in front of a carwash where access is the doorway to doing business." We agree that it is difficult to determine the value of a temporary easement. Nevertheless, an expert cannot arbitrarily assign a number. After reviewing Dunaway's testimony, it is clear that he did not consider any factors a reasonably prudent business person would consider when renting this strip of land. Thus, we conclude that his testimony was inadmissible as a matter of law. Mussig, supra, at 24. As such, appellant's third assignment of error has merit.
 {¶ 49} In sum, appellant's first assignment of error is without merit. His second and third assignments are sustained. The judgment of the Trumbull County Court of Common Pleas is reversed regarding the valuation of damages to the residue and to the temporary easement. It is otherwise affirmed on all other matters. This case is remanded for further proceedings consistent with this opinion.
[1] Richard A. Costal and David L. Costal own Costal Brothers t/a Splash Shine Auto Bath, and are appellees in this case. Additionally, Sky Bank, David A. Hines (Trumbull County Auditor), and Christ Michelakis (Trumbull County Treasurer), are also appellees in this case. For purposes of this appeal, however, when we refer to appellee, it is Costal Brothers t/a Splash Shine Auto Bath.
[2] Although appellant states that he is challenging the property owner's testimony in his second assignment of error, it is clear from his brief that he is actually challenging the expert's opinion testimony. Furthermore, in order for this argument to make sense, this assignment should read: "for which compensation could not be claimed as a matter of law[.]"
[3] We listed the factors which Dunaway considered in appellant's first assignment of error.